UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SHINDELL PICKERING,

                Plaintiff,

                                        17 Civ. _____

   vs.                                     **COMPLAINT**

CITY OF NEW YORK, Commissioner of the
New York City Department of Corrections (DOC)
Joseph Ponte, John/Jane Doe AMKC Warden,
John/Jane Doe AMKC 14 Lower Supervisory Defendants ##1-20,
John/Jane Doe AMKC 14 Lower DOC Officers ##1-3,

                Defendants.
------------------------------------------------------------X

        Plaintiff Shindell Pickering ("Plaintiff"), by his attorneys, Romano & Kuan, PLLC, for this Complaint, alleges as follows:

## PRELIMINARY STATEMENT

        1.     Shindell Pickering is the victim of a perverse and pervasive practice, in which New York City Department of Correction officers at New York City jails engage inmates to assault other inmates as a way to control and discipline those held in custody. This practice has been uncovered and substantiated by investigations of the New York City Department of Investigations and the DOC's Inspector General, resulted in two indictments in 2009 of correction officers, and acknowledged by Mayor Bill DiBlasio and the City Council.

        2.     The Bronx District Attorney ("DA") has explained that certain jail facilities on Rikers Island are run like an organized-crime family, where correction officers, under a system known as "The Program," would give "favored prisoners free reign to beat, rob and extort whomever they please" – to quote the outraged Daily News editorial.

3. In a January 29, 2009 editorial, The New York Times described this as a "horror story." The Times demanded that "the entire culture" at Rikers Island "needs to be changed" and laid the blame squarely on the New York City Department of Corrections for failing to properly train and supervise correction officers.

4. As a result of this culture of violence, Mr. Pickering was assaulted on or about April 29, 2016 while he was held as a pretrial detainee at the Anna M. Kross Center (AMKC) on Rikers Island. Though the correction officers' duty was to protect Mr. Pickering and the other inmates, they instead sanctioned, assisted and/or facilitated the assault and took no steps to prevent and/or protect Mr. Pickering from serious injury.

5. As a result of this assault, Mr. Pickering was stabbed in the head with a broom handle causing him to suffer a serious head injury, lacerations and disfiguring scars.

## JURISDICTION AND VENUE

6. This action arises under the Fourteenth Amendment to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

7. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1342(a)(3)-(4) and 1367(a).

8. The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

9. Mr. Pickering demands trial by jury in this action.

## PARTIES

10. Shindell Pickering is a citizen of the United States and a resident of Bronx, New York. At the time of the Incident, Mr. Pickering was a pre-trial detainee in DOC custody at Anna M. Kross Center (AMKC) on Rikers Island in Bronx, New York.

11. Defendant City of New York ("City") is a municipal corporation, which through its Department of Corrections, operates a number of detention facilities. The Department, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting and investigation of force by uniformed staff and inmates, access to medical and other program services mandated by local law and court orders, and the recovery and investigation of contraband seized inside the jails. In addition, senior officials in the Department are aware of and tolerate certain practices by subordinate employees in the jails, including these that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten Department policies or customs. The Department is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.

12. At all times relevant hereto, Joseph Ponte was the Commissioner of DOC, acting in the capacity of agent, servant, and employee of the City of New York, within the scope of his employment as such, and acting under color of state law. On information and belief, defendant Ponte, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the defendants referenced herein. As Commissioner, defendant Ponte was also responsible for the care, custody, and control of all

inmates housed in the Department's jails. As Commissioner, Ponte was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in the Department jails. In addition, at all relevant times, defendant Ponte was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the Unites States and of the State of New York. Defendant Ponte is sued in his individual capacity.

13. At all times relevant hereto, "John/Jane Doe AMKC Warden" was the Warden of GRVC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his/her employment as such, and acting under color of state law. On information and belief, defendant "John/Jane Doe AMKC Warden", whose actual name and shield number plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John/Jane Doe," was the AMKC Warden, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his/her employment as such, and acting under color of state law, was responsible for supervising correction officers, captains, Assistant Deputy Wardens (ADW) and other supervisors with respect to the care, custody, and control of inmates confined at AMKC. These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of the DOC facilities, including Department policies, procedures, directives and protocols. Defendant "John/Jane Doe AMKC Warden" is sued in his/her individual capacity.

14. At all times relevant hereto, "John/Jane Does AMKC 14 Lower Supervisory Defendants ##1-20", whose actual names and shield numbers plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so but who are sued herein by the fictitious

designation "John/Jane Doe," were the ADWs, Assistant Deputies of Security, and Captains responsible for supervising correction officers assigned to AMKC 14 Lower at the time of the Incident. As ADWs, Assistant Deputies of Security, and Captains, they were acting in the capacity of agent, servant, and employee of defendant City, within the scope of his/her employment as such, and acting under color of state law, were responsible for supervising correction officers with respect to the care, custody, and control of inmates confined at AMKC. These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of the DOC facilities, including Department policies, procedures, directives and protocols.

15. Defendants Ponte, "John/Jane Doe AMKC Warden", "John/Jane Does AMKC 14 Lower Supervisory Defendants ##1-20", are collectively referred to as the "Supervisory Defendants."

16. At all times relevant hereto, "John/Jane Doe AMKC 14 Lower DOC Officers ##1-3", whose actual names and shield numbers plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so but who are sued herein by the fictitious designation "John/Jane Doe," were correction officers within the DOC, acting in the capacity of agent, servant, and employee of defendant City, within the scope of their employment as such, and acting under color of state law. On information and belief, Defendants "John/Jane Doe AMKC 14 Lower DOC Officers ##1-3" worked at AMKC 14 Lower during the April 29, 2016 incident alleged herein, and directed, participated, sanctioned, facilitated and/or witnessed and failed to intervene or prevent the stabbing and beating of Mr. Pickering. Defendants "John/Jane Doe AMKC 14 Lower DOC Officers ##1-3" are sued in their individual capacity.

17.    Defendants "John/Jane Doe AMKC 14 Lower DOC Officers ##1-3" are collectively referred to as the "Individual Correction Officer Defendants."

## STATEMENT OF FACTS

### I.    RIKERS ISLAND: A History of Correction Officers Sanctioning Inmate Fights

18.    For years, through Department reports, civil litigation, and criminal indictments, the City and Supervisory Defendants have been aware of the routine, dangerous and unconstitutional sanctioning of inmate-on inmate violence at jail facilities on Rikers Island. In many instances, DOC staff directed, instigated, encouraged or sanctioned the use of inmate enforcers to discipline other inmates. That practice caused Mr. Pickering's injuries.

19.    In January 2007, Roger Cullen, a former correction officer, testified under oath about an inmate-on-inmate assault in May 2003 at AMKC. *See Jackson v. City of New York, et al.*, 04 Civ. 5799. In his deposition, Cullen testified that the inmate assailant had essentially been deputized as an enforcer by correction officers to control the other inmates. The inmate told the other inmates when to shower, when to lock in, and when to clean their cells. According to Cullen, another correction officer who was off his post at the time the assault occurred, made a false entry in the logbook and then asked Cullen to write a report that claimed that Jackson had slipped and fallen in the shower. According to Cullen, this practice where correction officers conspire to make false reports on incidents involving inmates was termed "write with us." Upon information and belief, as early as September 2003, Cullen complained to the Department about the above instances of corruption, as well as other instances involving misconduct ranging from excessive force to lying, to falsifying reports, to paying inmates with cigarettes to beat up other inmates.

20. On October 3, 2004, twenty-one year old inmate Tyreece Abney, while under the supervision of DOC, was fatally beaten by other inmates at George Motchen Detention Center ("GMDC") on Rikers Island. According to the DA's press release, a high ranking Bloods gang member and two accomplices attacked Abney "after Correction Officers expressed concern that Abney was becoming a 'discipline problem in the unit.'" *See* High Ranking 'Bloods' Gang Member Convicted of Assault in Deadly Beating that Claimed the Life of a Fellow Inmate on Rikers Island, at http:/bronxda.nyc.gov/information/2007/case13.htm.

21. On information and belief, testimony during the 2007 criminal trial of one of Abney's assailants revealed that shortly before the fatal attack, a correction officer told the inmates, "You men in the house, you need to speak to the new inmates, you need to get your house in order." In addition, during the criminal investigation, authorities learned that one of Abney's assailants had been receiving extra phone and mail privileges from a correction officer, who was also mailing coded messages for him. Yet, not one correction employee was charged or even disciplined.

22. In March 2007, Tyreek Shuford, a teenage inmate at Robert N. Davoren Center ("RNDC") on Rikers Island, was badly beaten by an inmate enforcer who controlled the housing area through violence and extortion, and the complicity of the correction officers. *See Shuford v. City of New York*, 09 Civ. 00945. According to allegations in the *Shuford* Complaint, the inmate enforcer ordered Mr. Shuford out of a chair to demonstrate his power and control. When Mr. Shuford refused, the enforcer and other inmates assaulted him in plain view of the officers. Not only did the officers fail to intervene to stop the attack, but Mr. Shuford – who was visibly and seriously injured – was denied any medical care until two days later.

23.     On April 16, 2007, Camillo Douglas and Luis Soriano, two RNDC inmates, were beaten by several inmates. *See Douglas v. City of New York*, 07 CV 8443. According to allegations in the *Douglas* Complaint, shortly before the institutional lock down at 11 p.m., a correction officer opened Mr. Douglas' cell enabling three inmate porters, who were members of the Bloods gang, to enter and attack Mr. Douglas with broomsticks and metal shanks. While Mr. Douglas was being beaten, a correction officer unlocked all the inmates' cells, enabling additional members of the Bloods gang to beat Mr. Douglas and Mr. Soriano (who had attempted to aid Mr. Douglas). Not a single correction officer attempted to intervene to protect Mr. Douglas or Mr. Soriano.

24.     A DOC investigation into the assault on Mr. Douglas and Mr. Soriano revealed that Bloods gang members instigated the assault to enforce their control over the feeding and telephone privileges of the other inmates in the housing area.

25.     On February 14, 2008, the Bronx District Attorney ("DA") indicted correction officer Lloyd Nicholson, for using inmates as enforcers and encouraging inmate-on-inmate violence. The DA charged Officer Nicholson with gang assault, assault, and official misconduct, in connection with a scheme to use inmates to enforce discipline at RNDC. According to the DA's press release, the "grand jury charged Nicholson with 'acting in concert' in causing physical injury to two inmates on June 10, 2007 by ordering six other inmates to beat them. One of the two victims sought medical attention and was taken to Elmhurst Hospital for treatment of a collapsed lung. *See* New York City Correction Officer Charged With Gang Assault For Allegedly Ordering Inmates On Rikers Island To Beat Fellow Detainees At the City Jail, at http://bronxda.nyc.gov/information/2008/case9.htm.

26. This indictment was the result of investigations by the New York City Department of Investigations and the Inspector General for DOC which, according to the DA, "uncovered a systematic program allegedly run by Nicholson, in which he would use a select group of inmates to maintain order and enforce discipline. The group of inmates would enforce rules of conduct established by Nicholson in exchange for preferential treatment, which included allowing them to extort commissary and telephone privileges as well as personal property from other inmates. It is alleged that Nicholson benefitted by not having to constantly monitor his post during his overnight tour of duty." *Id.*

27. On October 17, 2008, inmate Christopher Robinson died while under the supervision of the DOC, after being beaten by other inmates at RNDC.

28. The Bronx DA has alleged that Mr. Robinson was "brutally beaten because of his refusal to go along with a violent extortion enterprise against adolescent inmates which was jointly operated by the indicted correction officers and their teenage accomplices."

29. On information and belief, Mr. Robinson did not receive medical attention immediately after being beaten, but instead bled in holding cells for hours.

30. The investigation into Mr. Robinson's death revealed that nine separate officer-sanctioned beatings, of nine separate inmates, had occurred since July 2008 at RNDC.

31. On January 22, 2009 the Bronx DA indicted three correction officers for conspiracy, enterprise corruption, and/or assault. The DA, in his press release, alleged that correction officers "acting as managers for an organization referred to as 'the Program'. *See* The Death of An 18-Year Old Inmate on Rikers Island Last October Leads To Numerous Criminal

Charges Against Three Correction Officers and Twelve Teenage Inmates, at

http://bronxda.nyc.gov/information/2009/case3.htm.

32. Under "the Program," correction officers "would cede responsibility for maintaining order to inmates known as 'the Team' whom they personally selected." The Team would "maintain order" and, in exchange, the officers gave the Team special privileges and/or authorized the Team to extort property from other inmates. "Inmates who refused to go along with the Program were punished by being assaulted" by the Team. The officers would generally "designate the date, time, location and manner of the 'beatdown.'"

33. Through DOC's elaborate report system, the City and the Supervisory Defendants were aware of the pattern of a large number of incidents involving inmate-on-inmate violence and have failed to take sufficient steps to curb such beatings. As a result, the abuse continued.

34. The City and the Supervisory Defendants were also aware, or should have been aware, which staff members were involved in incidents in which inmates were injured by other inmates, yet, notwithstanding that information, they have failed to take sufficient steps to curb such beatings.

35. The City and the Supervisory Defendants were also aware, or should have also been aware of the failure of the Department to bring disciplinary charges against those officers who sanction or ignore inmate-on-inmate violence, punish staff that sanction and/or cover up such violence, and discourage others from doing so.

36. Through all these cases and Department reports, the City and the Supervisory Defendants have been made aware of the widespread practice by DOC staff of sanctioning or encouraging violence against inmates. They have also been made aware of the failures of DOC's

Investigation Division to adequately investigate allegations of correction officers' complicity in such beatings, a practice that causes further abuse.

## II.     The Assault on Shindell Pickering on April 29, 2016

37.     At around 8:00 a.m. on or about April 29, 2016, Shindell Pickering was transferred to 14 Lower from another AMKC housing area.

38.     He was unpacking his things inside his cell when several inmates entered and instructed him on the "Program" and the "Rules" of the house pertaining to lock in, phones, etc. Mr. Pickering responded in sum and substance that he would not abide by the inmates' claim of authority.

39.     After unpacking his things, Mr. Pickering walked out of his cell when suddenly several inmates began punching and kicking him. One of the inmates instructed a correction officer to open the supply room because "we gonna kill this nigga." The officer opened the supply room and allowed the inmates to grab brooms and scrub brushes that they used to beat Mr. Pickering. The same officer stood nearby watching Mr. Pickering being beaten and did nothing to intervene or stop the inmates. The officer in the bubble also saw what was happening and did nothing to intervene or stop the beating.

40.     Eventually, an officer intervened by sprayed chemical agent causing the inmates to disperse, but Mr. Pickering was already badly injured with a wooden broom handle sticking out of his head, blood streaming down his face, and cuts and bruises throughout his face and body.

41.     Mr. Pickering was taken to Elmhurst Hospital where he received emergency treatment. He sustained serious physical and emotional injuries that are ongoing.

## CLAIM FOR RELIEF
### 42 U.S.C. § 1983/ Fourteen Amendment/*Monell*
### (Against City of New York, Supervisory Defendants, and Individual Correction Officer Defendants)

42. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

43. On or about April 29, 2016, Shindell Pickering was attacked and seriously injured by inmate assailants, as alleged above.

44. By reason of the foregoing, and by directing, sanctioning, encouraging, assisting, and failing to prevent the inmate assailants from assaulting, battering, and using gratuitous, excessive, brutal, sadistic, and unconscionable force, the Supervisory and Individual Correction Officer Defendants deprived plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from gratuitous and excessive force and cruel and unusual punishment.

45. The Supervisory and Individual Correction Officer Defendants acted under pretense of color or state law and in their individual and official capacities and within the scope of their employments as DOC officers and employees. These defendants acted willfully, knowingly, and with the specific intent to deprive plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution.

46. The Supervisory Defendants knew and/or should have known that the pattern of sanctioned inmate-on-inmate assaults described above existed in the City jails prior to and including the time of the assaults on plaintiff. Their failure to take measures to curb this pattern

of brutality constitutes acquiescence in the known unlawful behavior of his subordinates. The prevalence of these practices and general knowledge of their existence at the time of plaintiff's slashing, and the failure of defendants to take remedial action despite the fact that the use of inmate enforcers had been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including the inmate named as a plaintiff in this action. These defendants' conduct had been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint.

47. Defendant City, through DOC, and acting under the pretense and color of law, has permitted, tolerated and been deliberately indifferent to a pattern and practice of sanctioned inmate-on-inmate assaults. This widespread tolerance of correction officers' sanction of inmate assaults constitutes a municipal policy, practice or custom and led to plaintiff's assault.

48. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant too which plaintiff was subjected to a brutal slashing by an inmate assailant on or about April 29, 2016, defendant City has deprived plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from gratuitous and excessive force and cruel and unusual punishment.

49. As a direct and proximate result of the misconduct, abuse of authority and the policy, practice and custom detailed above, plaintiff sustained the damages hereinbefore alleged.

## SECOND CLAIM FOR RELIEF

### Assault
### (Against Individual Correction Officer Defendants)

50. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

51. Defendants, acting within the scope of their employment, intentionally, willfully and maliciously assaulted plaintiff in that they directed, facilitated, encouraged, assisted or sanctioned inmates within their control to cause imminent harmful and /or offensive bodily contact and intentionally did a violent and/or menacing act which threatened such contact to plaintiff, and that such act(s) caused apprehension of such contact in plaintiff.

52. Pursuant to 28 U.S.C. §1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claim.

## THIRD CLAIM FOR RELIEF

### Battery
### (Against Individual Correction Officer Defendants)

53. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

54. Defendants, acting within the scope of their employment, intentionally, willfully and maliciously battered plaintiff in that they, in a hostile manner, directed, facilitated, encouraged, assisted or sanctioned inmates within their control to punch, strike, kick, and use weapons against plaintiff without his consent and with the intention of causing harmful and/or offensive bodily contact to plaintiff and caused such battery.

55. Pursuant to 28 U.S.C. §1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claim.

## FOURTH CLAIM FOR RELIEF

### Negligent Hiring, Retention, Training and Supervision
### (Against City and Supervisory Defendants)

56. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

57. Defendant CITY, Supervisory Defendants, and its employees, servants and or agents acting within the scope of their employment did negligently hire, train, retain and supervise defendants, individuals who were unfit for the performance of correction officer duties.

58. The acts of the Individual Correction Officer Defendant, an employee of Defendant CITY, Supervisory Defendants, and DOC were the result of Defendant CITY's negligence, in its hiring, training, retention, and supervision of its agents, servants and/or employees.

59. Pursuant to 28 U.S.C. §1367, this Court has pendant or supplemental jurisdiction to hear and adjudicate such claims.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiff requests that the Court grant the following relief jointly and severally against defendants:

1. Compensatory damages in an amount to be determined at trial for the physical and psychological injuries sustained by Shindell Pickering as a result of the events alleged herein.

2. Punitive damages in an amount to be determined at trial.

3. An order awarding plaintiff reasonable attorneys' fees, together with the costs of this action.

4. Such other further relief as the Court may deem appropriate.

Dated: July 28, 2017
New York, New York

ROMANO & KUAN, PLLC

Julia P. Kuan (JK 3822)
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5075
Julia.kuan@romanoandkuan.com

*Attorneys for Plaintiff*